# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **State of California, et al.,**<br><br>Petitioners,<br><br>**v.**<br><br>**United States Environmental Protection Agency, et al.,**<br><br>Respondents. | No. 18-1114, consolidated with 18-1118, 18-1139, 18-1162 |

Review of Final Action of the United States Environmental Protection Agency

**CORRECTED BRIEF OF *AMICI CURIAE* THE NATIONAL LEAGUE OF CITIES; THE U.S. CONFERENCE OF MAYORS; CITY OF NEW YORK, NY; LOS ANGELES, CA; CHICAGO, IL; KING COUNTY, WA; COUNTY OF SANTA CLARA, CA; SAN FRANCISCO, CA; BALTIMORE, MD; OAKLAND, CA; MINNEAPOLIS, MN; BOULDER COUNTY, CO; PITTSBURGH, PA; ANN ARBOR, MI; WEST PALM BEACH, FL; SANTA MONICA, CA; CORAL GABLES, FL; AND CLARKSTON, GA IN SUPPORT OF PETITIONERS**

Michael Burger (*counsel of record*)
 Columbia Environmental Law Clinic
 Morningside Heights Legal Services
Jessica Wentz
 Sabin Center for Climate Change Law
 Columbia Law School
435 W. 116th St.
New York, NY 10027
(212) 854-2372
michael.burger@law.columbia.edu

DATED: February 26, 2019          *Counsel for Local Government Amici*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amici curiae* submit this certificate as to parties, rulings, and related cases.

**(i)     Parties, Intervenors, and *Amici***

All parties, intervenors, and amici appearing in this court are, to the best of my knowledge, listed in the State Petitioners' Brief.

**(ii)    Rulings**

References to the rulings at issue appear in State Petitioners' Brief.

**(iii)   Related Cases**

References to related cases appear in State Petitioners' Brief.

# CORPORATE DISCLOSURES

The undersigned counsel for *amici* certifies that no corporation among *amici* has ever issued stock, and that none has a parent company whose ownership interest is 10 percent or greater.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURES ........................................................... ii

TABLE OF CONTENTS ................................................................... iii

TABLE OF AUTHORITIES ...............................................................iv

GLOSSARY OF ABBREVIATIONS ................................................ viii

IDENTITIES AND INTERESTS OF *AMICI CURIAE* ...........................1

ARGUMENT ...................................................................................9

    1. EPA Violated Regulations Establishing the Mid-Term Evaluation Procedure .................................................................................11

    2. EPA Failed to Articulate a Reasoned Basis for the Substantive Findings Underpinning the Revised Determination ....................................13

        (i)    Feasibility of the Standards in Light of Available Compliance Technologies and Consumer Preferences ................................14

        (ii)   Cost Impacts on Consumers....................................................20

        (iii)  Co-Benefits .............................................................................23

        (iv)  Safety......................................................................................24

        (v)   Emission Reductions...............................................................25

CONCLUSION .............................................................................26

# TABLE OF AUTHORITIES

**Cases**

*City of Dania Beach v. F.A.A.*,
    628 F.3d 581 (D.C. Cir. 2014)......................................................................14

*Esch v. Yeutter*,
    876 F.2d 976, 991 (D.C. Cir. 1989)..............................................................14

*IMS, P.C. v. Alvarez*,
    129 F.3d 618, 624 (D.C. Cir. 1997)..............................................................14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29, 43 (1983) ..........................................................................11, 16

*Nat'l Envtl. Dev. Ass'ns Clean Air Project v. Envtl. Prot. Agency*,
    752 F.3d 999, 1009 (D.C. Cir. 2014)..............................................................9

*Panhandle Eastern Pipe Line Co. v. FERC*,
    613 F.2d 1120, 1135 (D.C.Cir.1979)............................................................10

**Regulations**

40 C.F.R. § 86.1818-12........................................................ 10, 12, 13, 24

77 Fed. Reg. 62,623 (Oct. 15, 2012)......................................................15

82 Fed. Reg. 39,551 (Aug. 21, 2017)................................................11, 12

83 Fed. Reg. 16,077 (Apr. 13, 2018) .................................. 9, 12, 14, 15, 19, 20, 25

**Other Authorities**

Alana Miller et al., *Plugging In: Speeding the Adoption of Electric Vehicles in California with Smart Local Policies* (Environment California 2018) ..................17

Boulder County, *Environmental Sustainability Plan* (2012), https://bit.ly/2JXP7K8 ..............................................................................................................5

Boulder County, *GHG Inventory & SEP Analysis* (2013), https://bit.ly/2NVZws8 .................................................................................................7

City of Ann Arbor, *Climate Action Plan* (2012), https://bit.ly/2NkRokX ............5, 8

City of Ann Arbor, *Green Fleets,* https://bit.ly/2MyZvOp ......................................8

City of Baltimore, *Climate Action Plan* (2013), https://bit.ly/2MneBqx ..............5, 7

City of Chicago, *Chicago Climate Action Plan Progress Report: First Two Years* (2010), https://bit.ly/2Lqdm9g .................................................................4

City of Chicago, *Greenhouse Gas Inventory Report* (2015), https://bit.ly/2nGfcVo ...............................................................................................4, 5, 8

City of Coral Gables, *Sustainability Master Plan* (2015), https://bit.ly/2vjI3lQ ...............................................................................................5, 7, 8, 22

City of Los Angeles, *3rd Annual Report (2017-2018) on Implementation of the Sustainable City pLAn* (2018), https://bit.ly/2LDAK3l .........................................4, 8

City of Minneapolis, *Climate Action Plan* (2013), https://bit.ly/2ttPCXN ..............5

City of New York, *PlaNYC Exploring Vehicle Adoption in New York City* (2010), available at https://perma.cc/D22J .........................................................................20

City of New York, *Progress Report: OneNYC 2018* (2018), https://bit.ly/2trxz3F ...............................................................................................4

City of Oakland, *Energy and Climate Action Plan Update* (2018), https://bit.ly/2LVhzhB ...................................................................................... 5, 8

City of Pittsburgh, *Climate Action Plan v. 3.0* (Draft) (2017), https://bit.ly/2fx2R1F ...............................................................................................5, 8

City of San Francisco, *Climate Action Strategy Update* (2013), https://bit.ly/2z8Apvh ...................................................................................5

City of Santa Monica, *15x15 Climate Action Plan* (2013), https://bit.ly/2Pdjf7a.....8

City of West Palm Beach, *Energy Secure Cities Coalition*, https://bit.ly/2wqZtxj ..8

City of West Palm Beach, *Sustainability Action Plan* (2012),
https://bit.ly/2wklD59 ...................................................................................5

County of Santa Clara Office of Sustainability, *Driving to Net Zero –
Decarbonizing Transportation in Silicon Valley* (2014), https://bit.ly/2PMsFI2
.................................................................................................................8, 20

County of Santa Clara Office of Sustainability, *Framework for Creating the
Sustainability Master Plan* (2018), https://bit.ly/2PcecE9 ........................5

County of Santa Clara Office of Sustainability, *2018 Semi-Annual Sustainability
and Climate Action Report* (2018), https://bit.ly/2wuaBJN .....................8

David L. Greene, *A Trillion Gallons of Gasoline* (Howard L. Baker Jr. Center for
Public Policy, 2017), https://bit.ly/2AAgXwL ......................................22

David L. Greene & Jilleah G. Welch, *Impacts of Fuel Economy Improvements on
the Distribution of Income in the U.S.,* 122 ENERGY POLICY 528 (2018) ...............21

EPA, *Final Determination on the Appropriateness of the Model year 2022-25
Light-Duty Vehicle Standards Under the Midterm Evaluation*, EPA-420-R-17-001
(2017) .................................................................................................9, 23, 24

EPA, *Regulatory Impact Analysis: Final Rulemaking for 2017-2025 Light-Duty
Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel
Economy Standards*, EPA-420-R-12-016 (2012) ....................................23

Garrett Fitzgerald & Chris Nelder, *From Gas to Grid: Building Charging
Infrastructure to Power Electric Vehicle Demand* (Rocky Mountain Institute
2017), available at https://perma.cc/WD4L-Z8Q7 .................................22

*Global Covenant of Mayors for Climate & Energy*, https://bit.ly/2v1ec2c .............5

IPCC, SPECIAL REPORT: GLOBAL WARMING OF 1.5°C, SUMMARY FOR
POLICYMAKERS (2018) ...............................................................................2

Iyad Kheirbek et al., *The contribution of motor vehicle emissions to ambient fine particulate matter public health impacts in New York City: a health burden assessment*, 15 ENVIRONMENTAL HEALTH 89 (2016) ..............................................24

Keely Maxwell, et al., *Ch. 11: Built Environment, Urban System*, and CITIES IN IMPACTS, RISKS, AND ADAPTATION IN THE UNITED STATES: THE FOURTH NATIONAL CLIMATE ASSESSMENT, VOL. II (D.R. Reidmiller, et al., eds., 2018) .......................2

Kevin E. Trenberth et al., *Attribution of climate extreme events*, 5 NATURE CLIMATE CHANGE 725 (2015)...................................................................................4

King County, *Strategic Climate Action Plan* (2015) https://bit.ly/2OolzJd..........4, 7

New York City Department of Citywide Administrative Services, *Vehicle Fleets and Maintenance Reports* (2014-2018) ..................................................................25

New York City Mayor's Office of Sustainability, *1.5°C: Aligning New York City with the Paris Climate Agreement* (2017), https://on.nyc.gov/2n1JEcl ........4, 6, 7, 8

Nic Lutsey, *California's Continued Electric Vehicle Market Development* (International Council on Clean Transportation 2018)...........................................17

Peter Slowik & Nic Lutsey, *The Continued Transition to Electric Vehicles in U.S. Cities* (International Council on Clean Transportation 2018) .................................17

Roland Irle, *USA Plug-in Sales for 2018 Full Year*, http://www.ev-volumes.com/country/usa/ (last visited Feb. 4, 2019) .......................................16, 19

San Francisco Department of Environment, *2016 San Francisco Geographic Greenhouse Gas Emissions at a Glance* (2018), https://bit.ly/2Ot2IfT ...................7

*We Are Still in Coalition*, https://bit.ly/2AmLVIl (last visited Feb. 14, 2019) .........5

# GLOSSARY OF ABBREVIATIONS

APA          Administrative Procedure Act

EPA          Environmental Protection Agency

GHG          Greenhouse Gas

IPCC         Intergovernmental Panel on Climate Change

**IDENTITIES AND INTERESTS OF *AMICI CURIAE***

Local Government Amici consist of the nation's leading local

government associations as well as sixteen individual cities and counties located

throughout the country. The National League of Cities is the oldest and largest

organization representing municipal governments throughout the United States. Its

mission is to strengthen and promote cities as centers of opportunity, leadership,

and governance. Working in partnership with 49 State municipal leagues, the

National League of Cities serves as a national advocate for more than 19,000 cities

and towns, representing more than 218 million Americans. Its Sustainable Cities

Institute serves as a resource hub for climate change mitigation and adaptation in

its member cities. The U.S. Conference of Mayors is the official non-partisan

organization of U.S. cities with a population of more than 30,000 people

(approximately 1,400 cities in total). It is home to the Mayors Climate Protection

Center, formed to assist with implementation of the Mayors Climate Protection

Agreement whereby over 1,000 mayors have pledged to reduce their cities'

greenhouse gas ("GHG") emissions below 1990 levels. Individual members of the

coalition include New York, NY; Los Angeles, CA; Chicago, IL; King County,

WA; County of Santa Clara, CA; San Francisco, CA; Baltimore, MD; Oakland,

CA; Minneapolis, MN; Board of County Commissioners of Boulder County, CO

("Boulder County"); Pittsburgh, PA; Ann Arbor, MI; West Palm Beach, FL; Santa Monica, CA; Coral Gables, FL; and Clarkston, GA.

Climate change poses a grave threat to cities and localities across the United States. The Intergovernmental Panel on Climate Change ("IPCC") and the U.S. Global Change Research Program have both recognized that climate change is already having significant and costly effects throughout the world, and the situation will only worsen as GHGs continue to accumulate in the atmosphere. The IPCC Special Report on Global Warming of 1.5°C highlights the urgency of the situation, making clear that: (i) the world must pursue immediate and substantial greenhouse gas emission reductions and achieve net zero emissions by 2050 in order to have a chance of limiting global warming to 1.5°C, and (ii) if we remain within that target, there will still be widespread significant adverse effects – but the consequences will be far worse if we exceed the target. *See, e.g.*, IPCC, SPECIAL REPORT: GLOBAL WARMING OF 1.5°C, SUMMARY FOR POLICYMAKERS (2018). Despite broad recognition of this extraordinary risk, GHG emissions continue to increase, and the world remains on a trajectory toward catastrophic climate change.

Cities and local governments are at the frontlines of managing climate change and are uniquely affected by the impacts of climate change on human health, infrastructure, natural resources, and local economies. *See* Keely Maxwell et al., *Ch. 11: Built Environment, Urban System, and Cities* in IMPACTS, RISKS, AND

ADAPTATION IN THE UNITED STATES: THE FOURTH NATIONAL CLIMATE ASSESSMENT, VOL. II 444 – 447 (D.R. Reidmiller, et al., eds., 2018). Some key concerns for local governments include an increase in heat-related deaths, poor air quality and exacerbated health problems, longer droughts that combine with increased temperatures and water evaporation rates to strain water supplies, heightened wildfire risk, sea level rise, increasingly frequent and severe storms that pose immediate threats to human welfare and critical infrastructure, damaged and disappearing coastlines, and degraded ecosystems and reduced ecosystem services function in urban and non-urban areas alike.

For example, cities situated along the Atlantic coast such as New York City and Baltimore are exposed to the climate risks of, and in fact are already experiencing the impacts from, rising seas, extreme precipitation, and storm surge. Coastal cities in South Florida, including West Palm Beach and Coral Gables, face the additional risk of rising seas invading the limestone bedrock on which they sit and intruding into drinking water sources. In the Midwest, increasing temperatures, more frequent and intense heat waves, and more extreme precipitation events and flooding affect cities like Chicago and Ann Arbor. Cities and counties in the Western United States, including Los Angeles, San Francisco, Oakland, Santa Monica, Boulder County, King County, and the County of Santa Clara are also contending with the prospect of increased heat and drier summers as well as more

extreme precipitation and flooding during the wet season. Boulder County was among the Colorado localities that suffered catastrophic flooding in 2013, an event that scientists have concluded is evidence of the increased risks associated with climate change. *See* Kevin E. Trenberth et al., *Attribution of climate extreme events*, 5 NATURE CLIMATE CHANGE 725 (2015) (linking climate change to destructive storms, including Hurricanes Katrina and Sandy and the 2013 Boulder County floods). Many of the cities and counties in this coalition have also been affected by record-setting droughts, as well as more frequent and severe wildfires and the poor air quality caused by those fires. In addition, communities on the Pacific coast are coping with rising sea levels that threaten infrastructure and disproportionally affect those who have the fewest resources to prepare for and respond to increased flooding.

Local Government Amici are simultaneously trying to manage and recover from climate-related disasters and other recent impacts, prepare for future changes, and mitigate GHG emissions within their control.[1] The success of their efforts will

---

[1] *See, e.g.*, New York City Mayor's Office of Sustainability, *1.5°C: Aligning New York City with the Paris Climate Agreement* (2017), https://on.nyc.gov/2n1JEcl; City of New York, *Progress Report: OneNYC 2018* (2018), https://bit.ly/2trxz3F, at 78-90; City of Los Angeles, *3rd Annual Report (2017-2018) on Implementation of the Sustainable City pLAn* (2018), https://bit.ly/2LDAK3l; City of Chicago, *Chicago Climate Action Plan Progress Report: First Two Years* (2010), https://bit.ly/2Lqdm9g; City of Chicago, *Greenhouse Gas Inventory Report* (2015), https://bit.ly/2nGfcVo; King County, *Strategic Climate Action Plan* (2015),

ultimately depend on the actions taken by the federal government and other actors to control GHG emissions. This is particularly true for local efforts to control emissions from motor vehicles.

Reducing transportation emissions is essential to meeting local GHG reduction targets, as the transportation sector generates a substantial proportion of GHGs in the cities and counties represented herein. In some cases, transportation accounts for as much as 63% of overall emissions. *See* City of Oakland, *2015 Greenhouse Gas Emissions Inventory* Report (2018) at 19. Amici members have undertaken a variety of initiatives aimed at reducing vehicle miles traveled,

---

https://bit.ly/2OolzJd; County of Santa Clara Office of Sustainability, *Framework for Creating the Sustainability Master Plan* (2018), https://bit.ly/2PcecE9; City of San Francisco, *Climate Action Strategy Update* (2013), https://bit.ly/2z8Apvh; City of Baltimore, *Climate Action Plan* (2013), https://bit.ly/2MneBqx; City of Oakland, *Energy & Climate Action Plan Update* (2018), https://bit.ly/2LVhzhB; Boulder County, *Environmental Sustainability Plan* (2012) https://bit.ly/2JXP7K8; City of Minneapolis, *Climate Action Plan* (2013), https://bit.ly/2ttPCXN; City of Pittsburgh, *Climate Action Plan v. 3.0 (Draft)* (2017), https://bit.ly/2fx2R1F; City of Ann Arbor, *Climate Action Plan* (2012), https://bit.ly/2NkRokX; City of West Palm Beach, *Sustainability Action Plan* (2012), https://bit.ly/2wklD59; City of Coral Gables, *Sustainability Master Plan* (2015), https://bit.ly/2vjI3lQ. *See also Global Covenant of Mayors for Climate & Energy*, https://bit.ly/2v1ec2c (last visited July 27, 2018) (signed by Mayors or Leaders from New York, Los Angeles, Chicago, King County, San Francisco, Baltimore, Oakland, Minneapolis, Boulder, Pittsburgh, Ann Arbor, West Palm Beach, and Santa Monica); *We Are Still in Coalition*, https://bit.ly/2AmLVIl (last visited July 27, 2018) (signed by New York City, Los Angeles, Chicago, King County, San Francisco, Baltimore, Oakland, Boulder, Pittsburgh, Ann Arbor, West Palm Beach, Santa Monica, and Clarkston); *County Climate Coalition*, https://bit.ly/2MzczTX (established by Santa Clara County).

increasing the use of electric vehicles, and otherwise controlling transportation emissions, but they lack the authority to promulgate vehicle emission standards, which are one of if not the most effective tools for controlling emissions from this sector. These local governments therefore rely heavily on the motor vehicle GHG emission and fuel economy standards promulgated by the federal Environmental Protection Agency ("EPA") and National Highway Transportation Safety Administration, and by the California Air Resources Board, pursuant to the Clean Air Act (hereinafter, "Clean Car Standards") to mitigate emissions from one of the largest sources in the nation, and also to help them meet their emission reduction targets.

Consider the example of New York City, which has committed itself to reduce GHG emissions 80% below 2005 levels by 2050. New York City Mayor's Office of Sustainability (2017), *supra* note 1, at 41. Transportation sources constitute 30% of the City's overall emissions, and roughly 90% of those emissions come from private vehicle travel. *Id.* at 7, 11, 45. The City is implementing strategies to reduce vehicle miles traveled and promote the uptake of electric vehicles, but has found there is a need for "improved vehicle and efficiency standards" to help enable and accelerate emission reductions from the transportation sector. *Id.* at 26. One of the action items in the City's climate action

plan is to advocate for "aggressive federal regulation of GHG emissions" and more

stringent vehicle emission standards. *Id.* at 14, 26.

Similarly, San Francisco, aims to reduce emissions 80% below 1990 levels by

2050 and has reduced emissions from other sectors by an average of 38%, but has

only seen an 11% reduction in transportation emissions; it attributes the reduction

that has been achieved primarily to "higher fuel efficiency standards and cleaner

vehicle fuels mandated by the State of California." San Francisco Department of

Environment, *2016 San Francisco Geographic Greenhouse Gas Emissions at a

Glance* (2018), https://bit.ly/2Ot2IfT, at 13. Transportation emissions account for

45% of the emissions generated within San Francisco, and 91% of those emissions

are from passenger vehicles, *id.* at 5.

Oakland, Baltimore, Ann Arbor, Santa Monica, Coral Gables, Boulder

County, and King County have all issued similar findings highlighting the

importance of fuel efficiency and GHG emissions standards for light duty vehicles

in their GHG inventories, climate action plans, and sustainability plans.[2]

---

[2] *See, e.g.,* Boulder County, *GHG Inventory & SEP Analysis* (2013),
https://bit.ly/2NVZws8, at 18 (finding that federal greenhouse gas and fuel
economy standards were a primary driver of emission reductions in the
transportation sector); City of Baltimore (2013), *supra* note 1, at 19 (noting that the
clean car standards can contribute a significant percentage of overall predicted
GHG reductions in the city); City of Coral Gables (2015), *supra* note 1, at 24
(finding that increases in vehicle emissions were mitigated by federal emission
standards); King County (2015), *supra* note 1, at 26 (finding that federal standards

Local Government Amici are also aiming to "green" their vehicle fleets, or to support others in doing so, by procuring more efficient vehicles, and by promoting the use of zero emission and alternative fuel vehicles by the public.[3] The Final Determination on the Appropriateness of the Model year 2022-25 Light-Duty Vehicle Standards Under the Midterm Evaluation, EPA-420-R-17-001 (Jan. 2017) ("2017 determination") would help cities implement these planned fleet upgrades

---

are needed to meet its goal of reducing emissions 50% below 2007 levels by 2030, with the federal standards accounting for approximately 20% of the overall emission reductions needed to achieve this goal); City of Oakland (2018), *supra* note 1, at 4, 9, 21, 91 (noting that it intends to achieve emission reduction goals in part through more fuel efficient vehicles); City of Pittsburgh, *supra* note 1, at 62 (finding that increases in fuel efficiency have driven decreases in transportation emissions and that the EPA standards will help reduce on-road transportation emissions in line with the City's goal of reducing those emissions 50% below 2003 levels by 2030.); City of Ann Arbor (2012), *supra* note 1, at 3 (finding that decreases in transportation sector emissions from 2000 through 2010 were likely driven by improvements in fuel efficiency).

[3] *See, e.g.,* NYC Mayor's Office of Sustainability (2017), *supra* note 1, at 22; City of Los Angeles, *Sustainability City pLAn: Transforming Los Angeles* (2017), https://bit.ly/2Ot2RQk, at 79; City of Chicago, *Climate Action Plan; Strategy 3: Improved Transportation Options* (2008), https://bit.ly/1qbre4K, at 31; County of Santa Clara Office of Sustainability, *2018 Semi-Annual Sustainability and Climate Action Report* (2018), at 31-33, https://bit.ly/2wuaBJN; County of Santa Clara Office of Sustainability, *Driving to Net Zero – Decarbonizing Transportation in Silicon Valley* (2014), https://bit.ly/2PMsFI2 (the "Driving to Net Zero" initiative seeks to decarbonize transportation at both government and community levels through infrastructure planning that incentivizes the uptake of zero emission and alternative fuel vehicles); City of Oakland (2018), *supra* note 1, at 13, 50; City of Pittsburgh, *supra* note 1, at 62 (noting that it intends to achieve a 100% fossil fuel-free fleet by 2030); City of Ann Arbor, *Green Fleets,* https://bit.ly/2MyZvOp; City of West Palm Beach, *Energy Secure Cities Coalition*, https://bit.ly/2wqZtxj; City of Santa Monica, *15x15 Climate Action Plan* (2013), at 22, https://bit.ly/2Pdjf7a; City of Coral Gables (2015), *supra* note 1, at 24.

and support vehicle upgrades in the community by contributing to an increased supply of energy efficient vehicle options on the market and by lowering their cost.

EPA has decided to withdraw the 2017 determination and replace it with a *new* "final determination" whose only plausible reading is that the standards should be made less stringent. 83 Fed. Reg. 16,077 (Apr. 13, 2018) ("revised determination"). This decision was made without required procedures and without a reasoned basis or an appropriate grounding in evidence, would hinder local governments' ability to control GHG emissions from the transportation sector, and could make their commitments to purchase clean fleet vehicles more expensive by reducing options for low and zero emission vehicles. It would also render their adaptation efforts less effective by increasing GHG atmospheric concentrations. Local Government Amici thus have a strong interest in ensuring that the determination is reasonable, based on a sound factual record, and responsive to input from local governments and other stakeholders.

## ARGUMENT

Local Government Amici share the Petitioners' view that the revised determination is not a valid exercise of EPA's authority and should be vacated, and the 2017 determination reinstated.

"[A]n agency is bound by its own regulations." *Nat'l Envtl. Dev. Ass'ns Clean Air Project v. Envtl. Prot. Agency*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting

*Panhandle Eastern Pipe Line Co. v. FERC,* 613 F.2d 1120, 1135 (D.C. Cir. 1979)).

The regulations governing the mid-term evaluation require EPA to base its final determination regarding the appropriateness of the 2022-2025 Light-Duty Vehicle Standards on a record that has been made available for public review and comment, which must include a draft Technical Assessment Report, public comment on the draft Technical Assessment Report, and a detailed assessment of specific factors relevant to the establishment of GHG standards for motor vehicles. 40 C.F.R. § 86.1818-12(h). EPA plainly adhered to these requirements when issuing its 2017 determination: it published a 1,217-page Technical Assessment Report in July 2016, followed by a proposed determination in November 2016 that was supported by the Technical Assessment Report and a 719-page draft Technical Support Document (including responses to public comment on the Technical Assessment Report), and its final determination in January 2017, together with 174 pages of responses to comments on the proposed determination.

In issuing its revised determination, however, EPA did not adhere to these requirements, resulting in legal infirmities that must nullify the revised decision. In particular: (1) EPA violated the procedural and information disclosure requirements of 40 C.F.R. § 86.1818-12(h) by failing to adhere to the prescribed mid-term evaluation process, thus foreclosing the possibility of meaningful participation by cities and counties across the country; (2) EPA violated the

Administrative Procedure Act (APA) and the substantive requirement in 40 C.F.R. § 86.1818-12(h) that the mid-term evaluation determination be based on a detailed assessment of enumerated factors by issuing a revised determination that lacked any rational basis or factual support in the record. Due to these deficiencies, the revised determination is arbitrary and capricious and should be vacated. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'").

## 1. EPA Violated Regulations Establishing the Mid-Term Evaluation Procedure

As it proceeded through the mid-term evaluation process in 2016, EPA sought and received public comments at each step. This made it possible for interested parties to review the complex technical record and provide meaningful feedback to EPA, which EPA then referred to in its development of both the proposal and final rule.

EPA did not adhere to these requirements when issuing the revised determination. EPA did solicit public input on its initial decision to reconsider the determination. 82 Fed. Reg. 39,551. However, this solicitation did not include a proposed determination or any new technical data or analysis, nor did it otherwise

set forth any rationale for rescinding and reissuing the determination – rather, it contained a list of technical issues on which EPA was soliciting input accompanied by a confusing and seemingly contradictory statement that the Technical Assessment Report, the primary technical basis for the determination, "would not be reopened for comment." *Id.* at 39,553. EPA provided only 45 days for the public to respond to this vague and confusing solicitation. *Id.* at 39,552.

Despite these deficiencies, EPA did receive over 290,000 comments on this initial solicitation, demonstrating that there was significant public interest in this matter. See 83 Fed. Reg. at 16078. Nonetheless, EPA never published a revised technical analysis or a proposed version of the revised determination for public review and input. In sum: EPA never gave the public an opportunity to comment on its justifications for reversing course on the determination.

As a result, Local Government Amici were unable to provide fully informed and comprehensive input on the rationales underpinning the revised determination, such as EPA's conclusions about the feasibility of achieving the standards, costs, co-benefits, safety, and emission reductions. If they had been given a sufficient chance to comment on EPA's analysis, they could have raised the same concerns raised in this brief – that EPA's rationales for reversing course lack factual support – and they could have submitted additional evidence to the record which directly contradicts EPA's unsupported positions. Thus, EPA's failure to adhere to the

procedural requirements of 40 C.F.R. § 86.1818-12(h) resulted in not only the

exclusion of key stakeholders from this process but also, as explained further in

Petitioners' briefs and below, in a final decision that is arbitrary and capricious in

violation of the APA and the substantive requirements of 40 C.F.R. § 86.1818-

12(h).

## 2. EPA Failed to Articulate a Reasoned Basis for the Substantive Findings Underpinning the Revised Determination

EPA's stated rationales for reversing course on the mid-term evaluation

determination are factually incorrect and, in numerous cases, directly contradicted

by record evidence before the agency. State Pet. Brief, 41-49; Enviro. Pet. Brief,

13-18. EPA has failed to articulate a rational basis for this action, and instead has

relied on unsupported and inaccurate statements from automaker industry groups

as the key support for its decision (in many cases copying and pasting text from

their comments). Specific problems with EPA's analysis and treatment of the

factual record are detailed below.

As a threshold matter, Amici note that EPA has failed to provide an

adequate record for the purpose of judicial review due to both its procedural flaws

and the paucity of evidence in the revised determination. Accordingly, this Court

should consider not only the record underlying the 2017 determination – which

illustrates the fatal deficiencies in EPA's decision to reverse course – but also more

recent studies and evidence that EPA failed to mention in the revised determination. *See City of Dania Beach v. F.A.A.*, 628 F.3d 581 (D.C. Cir. 2014) (record can be supplemented if agency "deliberately or negligently excluded documents that may have been adverse to its decision," if background information is needed "to determine whether the agency considered all the relevant factors," or if the "agency failed to explain administrative action so as to frustrate judicial review") (internal quotes omitted); *IMS, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C. Cir. 1997) (appropriate to supplement the record where "the agency failed to examine all relevant factors… or the agency acted in bad faith… in reaching its decision"); *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (appropriate to introduce extra-record evidence to enable meaningful judicial review where procedural validity of agency action remains in serious question).

### (i)    Feasibility of the Standards in Light of Available Compliance Technologies and Consumer Preferences

EPA claims that the original standards may not be feasible due to technology constraints and that it was "too optimistic" in its original assumptions and projections with respect to the availability and effectiveness of compliance technologies. 83 Fed. Reg. at 16,079. To support this claim, EPA asserts that there has been a decline in electric vehicle sales since 2013, driven in part by decreasing consumer demand for electric and fuel-efficient vehicles, *id.*, and that "it would not

be practicable to meet the Model Year 2022-2025 emission standards without significant electrification and other advanced vehicle technologies that lack a requisite level of consumer acceptance." *Id*. at 16,081. Relatedly, EPA claims that "consumers' preferences must change to ensure that the current standards can be met" and suggests that there may be insufficient consumer demand for fuel-efficient vehicles and electric vehicles. 83 Fed. Reg. at 16,082-83. EPA's conclusions about the electric vehicle market, consumer preferences, and implications for the feasibility of the standards are unreasonable and unsupported by the record.

### a. Electrification Trends

As explained by Petitioners, EPA previously concluded that only modest levels of electrification would be needed to meet the model year 2025 standards, and has not cited any new facts or analysis to support its new conclusion that significant electrification may be needed for compliance with the standards. State Pet. Brief at 42-44; Envtl. Pet. Brief at 13-14. *See also* 77 Fed. Reg. 62,623, 62,917 (projecting that standards could be achieved with electric vehicles accounting for less than 3% of fleet sales). Recognizing that electrification is an *option* for compliance, Amici believe it is important to explain why EPA has failed to support its findings about electrification trends and consumer acceptance of electric vehicles.

Contrary to EPA's conclusion that electric vehicle sales are declining due to "decreasing consumer demand," electric vehicle sales have been increasing steadily since the original standards were issued, and electric vehicle sales across the country were up 81% in 2018.[4] As noted above, EPA did not publish a revised technical analysis to support its change in position, nor did it publish a compilation of the comments it received which would allow the public to review whatever evidence it may have to contradict these facts. Thus, EPA's conclusion, which relies on false factual assumptions, is arbitrary and capricious. *See State Farm*, 463 U.S. at 43 ("the agency must examine the relevant data…'').

Local Government Amici are familiar with issues pertaining to electric vehicle market penetration, as a result of their efforts to procure electric vehicles and increase electric vehicle use within their jurisdictions. Amici believe electric vehicle technologies have advanced significantly in recent years, and electric vehicle sales will continue to grow in the coming years, in part due to regulatory drivers and support programs they have put in place – all of which would make compliance with the standards even easier.

---

[4] Most of this growth occurred in the final quarter of the year, when new electric vehicle models with extended range were released. Multiple automobile manufacturers plan to release long-range models in 2019, which is expected to lead to continued growth in electric vehicle adoption. Roland Irle, *USA Plug-in Sales for 2018 Full Year,* http://www.ev-volumes.com/country/usa/ (last visited Feb. 4, 2019).

For example, the Los Angeles and San Francisco Bay areas have seen dramatic growth in electric vehicle sales in recent years, driven in part by a combination of federal standards, state regulation, and local government efforts. Nic Lutsey, *California's Continued Electric Vehicle Market Development* (International Council on Clean Transportation 2018). Los Angeles, Santa Monica, San Francisco, County of Santa Clara, King County, New York City, Chicago, Minneapolis, Boulder County, and many other local governments in the NLC and USCM have variously established electric vehicle market share targets, invested in electric vehicle charging infrastructure, and introduced a combination of requirements and incentives aimed at making it easier for private citizens to purchase and own electric vehicles, such as rebates for charging infrastructure, rebates for the purchase of used electric vehicles, and requirements for electric vehicle-ready parking spaces in new construction. Alana Miller et al., *Plugging In: Speeding the Adoption of Electric Vehicles in California with Smart Local Policies* (Environment California 2018); Peter Slowik & Nic Lutsey, *The Continued Transition to Electric Vehicles in U.S. Cities* (International Council on Clean Transportation 2018).

As a result of their procurement programs, local governments are also some of the largest electric vehicle purchasers in the country. Los Angeles, San Francisco, New York City, Chicago, Minneapolis, the County of Santa Clara,

Boulder County, Ann Arbor, and other local governments have established electric vehicle targets for their municipal fleets and have purchased thousands of electric vehicles to date, and have firm plans to purchase more in the coming years. They are also collaborating on these efforts. For example, in 2018, Los Angeles Mayor Eric Garcetti launched the Climate Mayors' Purchasing Collaborative, an online platform and resource portal that guides and encourages city leaders to obtain electric vehicles for municipal fleets. The Collaborative leverages the combined purchasing power of cities to show that demand for electric vehicles is real and growing, to ensure equal access at competitive prices to these vehicles, and to signal that municipalities will build the charging infrastructure needed to make electric vehicles the new normal.

Based on their experience, Local Government Amici know that the selection of electric vehicles available on the market has improved substantially, and electric vehicle technologies have already surpassed many critical thresholds related to mileage range, charging speed, and affordability. Using electric vehicles can significantly reduce fleet maintenance costs, even while fulfilling the same purposes of non-electric vehicles. Indeed, Local Government Amici's experience is that the vast majority of light duty vehicular needs can be met with currently existing electric vehicle technologies.

As noted above, EPA's 2017 determination concluded that compliance with the 2022-2025 standards would require low levels of electric vehicle market penetration. Nonetheless, those standards would provide a complementary regulatory backdrop and long-term incentives for automobile manufacturers consistent with Local Government Amici's policies and procurement preferences. What's more, following on the well-grounded conclusions in the 2017 determination, the combination of government support programs and private demand for electric vehicles would make it practicable for automobile manufactures to comply with the emission standards through electric vehicle sales in excess of those contemplated in the 2017 determination, potentially lowering the overall costs of compliance.

### b. *Consumer Acceptance*

EPA's conclusion that electric vehicles and other fuel-efficient and advanced vehicles "lack a requisite level of consumer acceptance," 83 Fed. Reg. at 16,081, is also without basis. As noted above, electric vehicle sales have grown consistently in recent years and electric vehicle demand is at an all-time high. *See* Irle, *USA Plug-in Sales*, *supra* note 2. Consumers want more efficient vehicles and are willing to pay more money for fuel economy. *See* Comments of the Consumer Federation of America, EPA-HQ-OAR-2015-0827 (submitted on October 5, 2017); Brief of Amicus Curiae Consumer Federation of America. For example,

market research contained within New York City's PlaNYC Exploring Vehicle Adoption in New York City affirms that there are a sizeable number of New Yorkers who are interested in purchasing EVs. PlaNYC Exploring Vehicle Adoption in New York City (January 2010), *available at* https://perma.cc/D22J-UXJ7. The County of Santa Clara conducted a similar study and found that nearly 60% of its residents said that an electric vehicle was either their preference or a vehicle type that they would strongly consider for their next purchase. County of Santa Clara Office of Sustainability, *Driving to Net Zero: Regional Electric Vehicle Outreach and Marketing Plan* (March 9, 2018), https://perma.cc/5QP6-NP9S, at 25.

**(ii)    Cost Impacts on Consumers**

EPA claims that the 2022-2025 standards will impose undue costs on consumers, particularly low-income consumers. 83 Fed. Reg. at 16,084. EPA's claim about cost impacts runs counter to its own evidence as laid out in the Technical Assessment Report, Technical Support Document, and 2017 final determination – and EPA does not identify *any* new evidence whatsoever to support its change in position. State Pet. Brief, 45-46; Envtl. Pet. Brief, 15-16. Its purported concern for consumers is a red herring.

EPA's overstatement of potential costs relies on cost estimates from third parties that are significantly higher than EPA's own projections, 83 Fed. Reg. at

16,085-86 (citing McAlinden et al.) and that were explicitly refuted by EPA in the 2017 determination. Technical Support Document at 4-17–4-20. EPA also failed to discuss peer-reviewed research submitted by other stakeholders finding that costs to consumers may actually be lower than EPA's original projections. *See e.g.,* Comments from the Institute for Policy Integrity, EPA-HQ-OAR-2015-0827, 8 (citing research from Anderson & Sallee (2011) finding that standards by one mile per gallon would have cost automakers only $9-$27 per vehicle); Comments from the Environmental Defense Fund, EPA-HQ-OAR-2015-0827, 41-42, Appendix E (explaining problems with the McAlinden et al. study). Indeed, research has shown that fuel economy improvements to light-duty vehicles from 1975 to 2015 resulted in cost savings across all income levels, with low-income consumers receiving the greatest savings relative to their income. *See* David L. Greene & Jilleah G. Welch, *Impacts of Fuel Economy Improvements on the Distribution of Income in the U.S.*, 122 ENERGY POLICY 528 (2018) (cited at 83 Fed. Reg. at 16,084). The current generation of fuel-efficient vehicles and electric vehicles also tend to have a lower cost of ownership than other vehicles due to reduced fuel and maintenance costs, and research submitted to EPA on the effects of past and present standards shows that "the consumer pocketbook savings of fuel economy standards have far exceeded the cost of technology." Comments of the Consumer Federation of America, EPA-HQ-OAR-2015-0827 (submitted on October 5, 2017) at 47. *See*

*also* Garrett Fitzgerald & Chris Nelder, *From Gas to Grid: Building Charging Infrastructure to Power Electric Vehicle Demand* (Rocky Mountain Institute, 2017), *available at* https://perma.cc/WD4L-Z8Q7 (savings related to fueling an electric car in the US compared to an internal combustion engine vehicle range from between $10,700 to $16,528 per electric vehicle over the vehicle lifetime); Comments of Amory B. Lovins, EPA-HQ-OAR-2015-0827 (submitted Oct. 3, 2017).

The studies showing that increases in fuel economy result in relatively minor purchase cost increases and significant net savings accords with Local Government Amici's experience with vehicle procurement. For example, the City of Coral Gables found that procuring more fuel-efficient vehicles had among the highest returns on investment (494%) of all climate and sustainability strategies evaluated. Coral Gables (2015), *supra* note 1, at 46. This is because the emission savings from driving more efficient vehicles are substantial, and the costs of purchasing those vehicles are largely offset by reductions in fuel costs in the long term. The same is true for non-government consumers: many studies, including those conducted by EPA, have found that increasing vehicle efficiency has the added benefit of reducing fuel costs for consumers. *See, e.g.,* David L. Greene, *A Trillion Gallons of Gasoline* (Howard L. Baker Jr. Center for Public Policy, 2017), https://bit.ly/2AAgXwL (finding that fuel economy improvements to cars and light

trucks since 1975 have saved U.S. drivers approximately $4 trillion in fuel costs);

EPA, *Regulatory Impact Analysis: Final Rulemaking for 2017-2025 Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards*, EPA-420-R-12-016 (2012) (finding that the 2017-2025 standards would deliver significant cost savings for consumers due to reduced fuel usage). In addition, Los Angeles has found that low-income customers tend to purchase used vehicles, in which case having more used electric vehicles available will benefit them, or smaller and more fuel-efficient new vehicles, in which case their consumer preferences are well-aligned with the clean car standards. Some local governments also assist low income consumers' purchase of electric vehicles through a variety of programs, including rebates.

Finally, the public health benefits of higher fuel efficiency cars and electric vehicles are tremendously valuable to many low-income communities struggling with poor air quality. EPA's own record shows that the anticipated benefits "are projected to far outweigh the costs, with net benefits totaling nearly $100 billion over the lifetime of [model year] 2022-2025 vehicles." 2017 determination at 24.

### (iii) Co-Benefits

EPA arbitrarily discounts the importance of co-benefits, specifically reductions in other air pollutants, by saying that it may be more "efficient" to regulate those pollutants under other Clean Air Act provisions, particularly the

National Ambient Air Quality Standards program. 83 Fed. Reg. at 16,085. This utterly unsubstantiated statement is deeply troubling to Local Government Amici, many of whom are still struggling with air quality issues, primarily due to emissions from vehicles. *See* Iyad Kheirbek et al., *The Contribution of Motor Vehicle Emissions to Ambient Fine Particulate Matter Public Health Impacts in New York City: a Health Burden Assessment*, 15 ENVTL. HEALTH 89 (2016). For cities in National Ambient Air Quality non-attainment areas and familiar with limitations to thisprogram it is patently clear that a federal rule to improve fuel economy and reduce GHG emissions from motor vehicles is a highly efficient means of reducing overall air pollution, including emissions of criteria pollutants. *See* Brief of Amicus Curiae South Coast Air Quality Management District.

### (iv)  Safety

EPA claims that the standards may make vehicles less safe in part due to slower fleet turnover, as newer vehicles tend to have more safety features. 83 Fed. Reg. at 16,086. EPA provides no support whatsoever for its claim regarding fleet turnover rates or safety—in contrast to the extended analysis and discussion presented in the Technical Assessment Report and the 2017 determination (2017 Determination at 26-27; Technical Assessment Report at 8-1 to 8-62; Proposed Determination at A-95-98), based upon which EPA concluded that the standards had no adverse effect on safety (2017 Determination at 27). In fact, fuel-efficient

vehicles and electric vehicles have consistently received high safety evaluations, and fuel economy, emission reductions, and safety improvements have occurred simultaneously. *See* Comment of the Consumers Union, EPA-HQ-OAR-2015-0827 (submitted October 5, 2017) at 13; New York City Department of Citywide Administrative Services, *Vehicle Fleets and Maintenance Reports* (2014-2018) (from fiscal year 2014 through 2018, New York City improved its fleet's fuel economy by 78% and reduced the traffic fatality rate by 33%).

### (v) Emission Reductions

One of the factors that EPA must evaluate in its mid-term evaluation determination is the impact of the standards on GHG emission reductions. 40 C.F.R. 86.1818-12(h)(1)(iv). EPA's analysis of this factor in the revised determination is entirely deficient. There is no meaningful discussion of the projected emission reductions from the standards currently in place, potential changes in emission reductions under less stringent standards, or how emissions-related considerations factored into EPA's assessment of the appropriateness of the standards. *See* 83 Fed. Reg. at 16,084-85 (speculating that emission reductions from more efficient vehicles may be offset by consumers driving more). What is more: there is no mention whatsoever of "climate change" or the urgent need to reduce emissions from motor vehicles in order to protect the health and welfare of U.S. citizens, the primary purpose of the Clean Air Act. 42 U.S.C. § 7401(a)(2),

(b)(1). As discussed above, Local Government Amici are already managing severe and costly impacts related to sea level rise and changing weather patterns. As such, they are deeply concerned about EPA's failure to account for the benefits of climate action in its evaluation of standards that are explicitly intended to mitigate climate change through GHG emission reductions.

## CONCLUSION

For the reasons set forth above, and in briefs submitted by Petitioners and other amici, EPA's revised determination should be vacated and the original 2017 determination should be reinstated.

Dated: February 26, 2019

Respectfully Submitted,

/s  Michael Burger
MICHAEL BURGER
    Columbia Environmental Law Clinic
    Morningside Heights Legal Services
Jessica Wentz
    Sabin Center for Climate Change Law
435 W. 116th St.
New York, NY 10027
212-854-2372

FOR THE NATIONAL LEAGUE
OF CITIES

Clarence E. Anthony
  CEO and Executive Director
National League of Cities
660 North Capitol Street NW
Suite 450
Washington, DC 20001
202-626-3000


FOR THE CITY OF NEW YORK

Zachary W. Carter
  Corporation Counsel for the City of
  New York
Hillary Meltzer
  Chief, Environmental Law Division
Kathleen C. Schmid,
  Senior Counsel, Environmental Law
  Division
Robert L. Martin,
  Assistant Corporation Counsel,
  Environmental Law Division
New York City Law Department
100 Church Street
New York, NY 10007
212-356-2070

FOR THE U.S. CONFERENCE OF
MAYORS

Tom Cochran
  CEO and Executive Director
The U.S. Conference of Mayors
1620 I Street NW
4th Floor
Washington, DC 20006
202-293-7330


FOR THE CITY OF LOS
ANGELES

Michael N. Feuer
  City Attorney
Michael J. Bostrom
  Assistant City Attorney
Los Angeles City Attorney's Office
200 North Spring Street, 14th Floor
Los Angeles, CA 90012
213-978-1882

FOR THE CITY OF CHICAGO

Edward N. Siskel
  Corporation Counsel
Diane M. Pezanoski
  Deputy Corporation Counsel
Jared Policicchio
  Supervising Assistant Corporation
  Counsel
City of Chicago
30 N. LaSalle Street, Suite 1400
312-744-1438

FOR KING COUNTY

Daniel T. Satterberg
  King County Prosecuting Attorney
Jennifer Stacy
  Senior Deputy Prosecuting Attorney
W400 King County Courthouse
516 Third Ave
Seattle, WA 98104
206-477-1120

FOR THE COUNTY OF SANTA
CLARA

James R. Williams
  County Counsel
Office of the County Counsel
70 West Hedding Street, 9th Floor
San Jose, California 95110-1770
408-299-5900

FOR THE CITY OF SAN
FRANCISCO

Dennis J. Herrera
  City Attorney
Office of the City Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102
415-554-4700

FOR THE CITY OF BALTIMORE

Andre M. Davis
  City Solicitor
City of Baltimore
100 N. Holliday Street, Suite 101
Baltimore, MD 21202
410-396-8393

FOR THE CITY OF OAKLAND

Barbara J. Parker
  City Attorney
City of Oakland
One Frank H. Ogawa Plaza
Sixth Floor
Oakland, CA 94612
510-238-3601

FOR THE CITY OF
MINNEAPOLIS

Kim Havey
 Director
City Coordinator's Division of
Sustainability
350 South 5th Street, Room 315M
Minneapolis, MN 55415
612-673-3666

FOR THE CITY OF PITTSBURGH

Yvonne S. Hilton
 City Solicitor
City of Pittsburgh Department of
Law
414 Grant Street
Pittsburgh, PA  15219-2453
412-255-2015

FOR THE CITY OF WEST PALM
BEACH

Jeri Muoio
 Mayor
Mayor's Office Administration
City of West Palm Beach
401 Clematis Street
West Palm Beach, FL 33401
561-822-1400

FOR BOULDER COUNTY

David Hughes
 Deputy County Attorney
Boulder County Attorney's Office
P.O. Box 471
Boulder, CO 80306
303-441-4976

FOR THE CITY OF ANN ARBOR

Stephen Postema
 City Attorney
Matthew R. Rechtien, P.E.
 Senior Assistant City Attorney
City of Ann Arbor
301 E. Huron Street
Ann Arbor, MI  48104
734-794-6174

FOR THE CITY OF SANTA
MONICA

Lane Dilg
 City Attorney
City of Santa Monica
1685 Main Street, Third Floor
Santa Monica, CA 90401
310-458-8336

FOR THE CITY OF CORAL
GABLES

Miriam Soler Ramos
 City Attorney
City of Coral Gables
405 Biltmore Way, 2nd Floor
Coral Gables, FL 33134
305-460-5084

FOR THE CITY OF CLARKSTON

Ted Terry
 Mayor
City of Clarkston
1055 Rowland Street
Clarkston, GA 30021
404-585-0833


## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of D.C. Cir. R. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because it meets the prescribed format requirements and does not exceed 6,500 words. This brief also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5)&(b) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.


Dated: February 26, 2019                    /s  Michael Burger_____
                                            MICHAEL BURGER

## CERTIFICATE OF SERVICE

I certify that the foregoing BRIEF OF *AMICI CURIAE* THE NATIONAL LEAGUE OF CITIES; THE U.S. CONFERENCE OF MAYORS; CITY OF NEW YORK, NY; LOS ANGELES, CA; CHICAGO, IL; KING COUNTY, WA; COUNTY OF SANTA CLARA, CA; SAN FRANCISCO, CA; BALTIMORE, MD; OAKLAND, CA; MINNEAPOLIS, MN; BOULDER COUNTY, CO; PITTSBURGH, PA; ANN ARBOR, MI; WEST PALM BEACH, FL; SANTA MONICA, CA; CORAL GABLES, FL; AND CLARKSTON, GA was served today on all registered counsel in these consolidated cases via the Court's CM/ECF system.


Dated: February 26, 2019             /s  Michael Burger

                                     MICHAEL BURGER